IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


MARK ANTHONY TEAS                                          PLAINTIFF


        v.                      Civil No. 07-5146


SHERIFF KEITH FERGUSON;
CAPTAIN HUNTER PETRAY;
SGT. DARREN FAULKENBBURY;
OFFICER BAKER; DEPUTY GRANT;
DEPUTY UNDIANO; OFFICER PAUL;
and OFFICER BECKER                                         DEFENDANTS


### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

        Mark Anthony Teas brings this *pro se* civil rights action pursuant to 42 U.S.C. § 1983.
While he was an inmate of the Benton County Detention Center, Teas contends his constitutional
rights were violated in the following ways: (1) on October 5, 2006, when excessive force was
used against him; (2) on October 26, 2006, when excessive force was used against him; (3) when
he was denied access to the courts; and (4) when his grievances were ignored and/or he was
retaliated against by Sergeant Faulkenbury because of his use of the grievance procedure.

        Defendants filed a motion for summary judgment (Doc. 42).  To assist plaintiff in
responding to the motion, I entered an order (Doc. 59), directing Teas to complete, sign, and
return an attached questionnaire that would serve as his response to the motion.  Teas filed a
timely response to the court's questionnaire (Doc. 61).  The case is currently before the
undersigned for the issuance of a report and recommendation on the summary judgment motion.

-1-

# I. BACKGROUND

Teas was booked into the Benton County Detention Center (BCDC) on October 4, 2006, on pending criminal charges. *Plaintiff's Response* (Doc. 61)(hereinafter *Resp.*) at ¶ 1; *Defendants' Exhibit* (hereinafter *Defts' Ex.*) 1 at pages 1-3. He remained incarcerated there until transferred to the Arkansas Department of Correction on December 4, 2007. *Id.* at ¶ 131.

On October 5, 2006, Teas requested to be placed on administrative segregation because he had been an informant for Andy Lee and there were people in the jail who would want to kill him. *Resp.* at ¶ 2. He was placed on protective custody and remained there until April 22, 2007, when he was removed at his request. *Id.* at ¶ 3.

On October 5, 2006, Teas was transported to the Bentonville Police Department for questioning. *Resp.* at ¶ 4. Shortly before 4:00 p.m. Officer Ryan Suedel heard an extremely loud thud from cell door #2 and looked in the window and noticed Teas lying on the floor. *Id.* at ¶ 5(A). Suedel opened the cell door and called to Teas. *Id.* at ¶ 5(B). Within moments Teas sat up and stated he believed he had a seizure. *Id.*

Teas was asked what medical condition he had that would have caused him to have a seizure. *Resp.* at ¶ 6(A). He responded that he had just been assaulted by some jailers. *Id.* Teas offers the affidavit of Eddie Sutton in support of his claim.[1] *Resp.* at page 111. Sutton indicates on October 5th he witnessed four deputies, including Sergeant Faulkenbury, jump on Teas and

---

[1]Teas also submitted what purports to be an affidavit of Charles Townsend which states he witnessed on October 4th four deputies, including Faulkenberry and Grant, jump on and beat Teas for no reason. *Resp.* at page 110. The affidavit is not notarized or signed under penalty of perjury. Unsworn statements are hearsay and therefore not cognizable on summary judgment. *Mays v. Rhodes*, 255 F.3d 644, 648 (8th Cir. 2001). For the same reasons, the court will not consider the unsworn statement of Charles Smith, marked exhibit G, *Resp.* at page 116.

-2-

then spray him with pepper spray. *Id.* Sutton indicated Teas was chained to the floor grate while he was kicked and punched. *Id.*

An ambulance was called and Teas was transported to Northwest Medical Center emergency room. *Resp.* at ¶ 8(C). Suedel rode with Teas. *Id.* at ¶ 8(D). Teas gave detailed statements as to how he hit his head. *Id.* Suedel noted Teas had a red mark on his head which was beginning to swell. *Id.* A head CT showed mild soft tissue swelling on the scalp overlying the right front bone. *Id.* at page 113. An x-ray of the lumbar spine showed a fracture through the left L1 transverse process, age indeterminate. *Id.* at page 114.

While Suedel was at the hospital with Teas, Teas repeatedly got up from his bed, went to the restroom, and attempted to wander about the hospital room. *Defts' Ex.* 5 at page 2. Teas was acting as if he was well. *Id.*

Officer Moffit relieved Suedel. *Resp.* at ¶ 8(G). Teas went to the restroom again and left it concealing a large amount of liquid soap in his hand. *Defts' Ex.* 5 at page 2. Moffit made Teas wash the soap off. *Id.* Teas was released and taken back to the BCDC. *Resp.* at ¶ 8(K).

On October 5th, Faulkenbury reported that he was in booking when Suedel called from the emergency room and advised that Teas had hit his head on the cell door and fallen over into convulsions. *Resp.* at ¶ 9(A). Suedel wanted to know which department was responsible for the bill. *Id.* at ¶ 9(B). Faulkenbury responded that since Teas was in the custody of the police department at the time of the incident that they would be responsible for the medical charges. *Id.*

On October 5th at 8:00 p.m., Faulkenbury reported Teas was kicking the door to holding cell #7. *Resp.* at ¶ 10(A). According to Faulkenbury,

-3-

Inmate Teas, Mark was kicking the door to holding cell #7.  I instructed Inmate Teas to stop kicking the door to the cell.  As I turned away from the cell Inmate Teas kicked it again very hard.  I called for the door to be opened and told Inmate Teas to back up and get on the floor.  As I opened the door to the cell Inmate Teas moved his right leg back and assume a "bladed" stance.  Inmate Teas also began to take off his shirt, and said, "Come on, come get some."  Inmate Teas stuck his head back out through the neck of his shirt and I administered a short burst of O.C. spray to his face.  I backed up and closed the door.  I instructed Deputies Brown and Vaughn to decontaminate Inmate Teas when he became compliant.  I returned to my duties without any further incident.

*Defts' Ex.* 3 at page 1.

According to Teas, he never kicked the door, didn't break any rules, and never heard Faulkenbury say anything.  *Resp.* at ¶¶ 10(B) & ¶ 10(F).  Teas maintains it was the inmate in the next cell who was kicking the door.  *Id.* at ¶ 10(C).  At the time, Teas maintains he was naked and in five-point restraints.  *Id.* at ¶ 10(G).  He asserts Faulkenbury sprayed him in the face and crotch.  *Id.*  Teas also cites the court the affidavit of Eddie Sutton.  *Resp.* at pages 110-111.  Moreover, Teas states if he had made any type of threat against Faulkenbury he would have been charged with a disciplinary.  *Id.* at ¶ 10(E).

Teas maintains it was hours later before he was decontaminated.  *Id.* at ¶ 10(J).  As a result, he states the spray left blisters on his face and genitals.  *Id.*

On October 18th Teas requested access to the law library.  *Resp.* at ¶ 13; *Defts' Supp. Ex.* 4 at page 1.  Teas was informed he had been assigned a public defender and the public defender's address was provided.  *Id.*  While Teas was informed this, he states he had never been to court for the public defender's office to be appointed.  *Resp.* at ¶ 13.

-4-

On October 20th Teas complained he had been refused access to the law library. *Resp.* at ¶ 15. He complained he did not have an attorney and that Lt. Carter approved his access to the law library. *Id*. However, Teas states they "wouldn't take me." *Id.*

On October 22nd Teas asked why he had been denied use of the law library. *Resp.* at ¶ 18. He was informed that law library use was approved by Lt. Carter. *Id.*

On October 26th, Deputy Undiano reported that he was performing a shakedown with SERT. *Resp.* at ¶ 22(A). At approximately 20:30 hours or 8:30 p.m., banging and yelling was heard from Teas' cell, 216 in E-102. *Id.* Corporal Paul, Corporal Becker, Deputy Hernandez, and Undiano entered E-102 and approached Teas' cell. *Id.* According to Undiano's report the following occurred:

> I ordered Inmate Teas to get on the floor and received no compliance. The cell door was opened and Corporal Becker placed Inmate Teas on the floor. I gained control of Inmate Teas's right arm and put handcuffs on him. Corporal Paul took control of Inmate Teas's arms and I exited the cell and went to pod control to get leg restraints. I re-entered E-102 and returned to cell 216 with leg restraints. Corporal Paul and Corporal Becker put on the leg restraints and connected his handcuffs and leg restraints with a pair of handcuffs. Corporal Paul then asked Inmate Teas why he was kicking the door. Inmate Teas stated, "Because I have to take a shit, and I wanted toilet paper!" I checked Inmate Teas for injury; he did not appear to be injured in any way. I exited the cell and returned to my duties without further incident.

*Defts' Ex.* 3 at page 4.

Teas maintains he never heard a direct order to get on the floor. *Resp.* at ¶ 22(B). He notes he never received a disciplinary for disobeying an order. *Id.*

Teas also denies that Becker placed him on the floor. *Resp.* at ¶ 22(C). Teas states he was already face down on the floor when the deputies came into the cell. *Id.* at ¶ 22(C) & ¶ 22(J). Teas asserts the deputies were very aggressive and rough. *Id.* at ¶ 22(J). He states they

-5-

cuffed and shackled him with no problems. *Id.* Teas states he was not resisting in anyway. *Id.*

According to Teas, once he was in the five-point restraints, the deputies punched him numerous times, were dropping their weight on him, kneeing him in the side, smashing his head into the concrete. *Resp.* at ¶ 22(J). He asserts the deputies were coming at him from all directions. *Id.* He indicates Paul was punching, kneeing and kicking him. *Id.* at ¶ 22(D). He also states Paul sprayed him. *Id.*

He believes he was sprayed with O.C. spray so that he couldn't see who was punching him. *Resp.* at ¶ 22(J). He indicates Undiano kicked him in the crotch. *Id.* Teas alleges this was a training exercise and he was the guinea pig. *Id.*

Teas states his side hurt for months. *Resp.* at ¶ 22(J). He also indicates the cuffs were put on so tight that he still has scars and he still has difficulty with his wrist and hand. *Id.*

Teas denies he was kicking the cell door. *Resp.* at ¶ 22(F). He states he was knocking on it trying to get their attention. *Id.*

Teas indicates he remained in restraints for approximately two hours with O.C. spray on him. *Resp.* at ¶ 22(H). He indicates Deputy Dapp found him in a pool of blood and called Faulkenbury. *Id.* at ¶ 22(J). Teas indicates his face was swollen and black and blue. *Id.*

At approximately 10:19 p.m. Deputy Martinez reported that he was told Teas needed to be transported to the hospital. *Resp.* at ¶ 23(A). On the way to the hospital, Teas stated that SERT had jumped on him and put him in a five point restraint, even though he was laying flat on the floor with his hands behind him. *Id.*

At the hospital, Martinez noted Teas told the nurses that he had been vomiting blood. *Resp.* at ¶ 23(B). He also indicated that the pain was on his left side and under his ribs. *Id.*

-6-

When asked by the doctor, Martinez noted Teas told her that the pain was on his left side and under his ribs and he didn't know why it was hurting. *Id.*

A nostril gastric tube was used to check if there was blood in Teas stomach and there was none so he was told he could return to the jail. *Resp.* at ¶ 23(C). He was discharged from the emergency department of St. Mary's Hospital with Phenergan and instructions to use Pepcid AC daily for two weeks and to consume clear liquids for the next twelve hours. *Id.* at ¶ 21.

On October 28th Teas submitted a medical request stating he needed help with his mental problems. *Resp.* at ¶ 25(A). He indicated that he had blacked out on the 27th and was slammed to the floor, his ribs bruised, he was choked, and his arms almost broke. *Id.* He asked for help getting the right meds before something like that happened again. *Id.* In response, he was put on the list to see the doctor on November 1st. *Id.*

Teas request to use the law library was approved on October 30th. *Resp.* at ¶ 26. However, Teas states they refused to take him to the law library. *Id.*

On November 9th Teas submitted a medical request stating his stomach was bleeding again. *Resp.* at ¶ 31(A). He said the meat was causing him to be sick again and throw up blood. *Id.* at ¶ 31(B). He was seen on the 15th and prescribed famotidine. *Id.* at ¶ 31(C).

On November 25th Teas submitted a grievance complaining of a sexual assault by Officer Vanetta. *Resp.* at ¶ 33. Teas stated as Vanetta was escorting Teas to medical he stepped on the wax and Vanetta grabbed his "a--" and then his arm and told him to get off his wax. *Id.* On the way to the nurse's station Teas stated Vanetta also said Teas was "buff and tight." *Id.*

On November 28th Teas was instructed by Nance to go back into E-102 and pick up the newspaper he had torn up and bring it back to pod control. *Resp.* at ¶ 34(A). Teas went back

-7-

into E-102 and picked up the newspaper and yelled: "You F------ B----." *Id.* at ¶ 34(B). Teas brought the newspaper out to pod control and threw it in the trash. *Id.* Larkin instructed Teas to return to his cell and that his recreation time was over. *Id.* at ¶ 34(D). Teas returned to his cell and slammed the door shut. *Id.* While in his cell, Teas was yelling: "They're coming to beat me up, there's five of them out there." *Id.* at ¶ 34(E).

According to Deputy Larkin, Inmate Wilkinson began to talk to Teas through his cell door so Deputy Collins entered E-102 and told Wilkinson to return to his cell. *Defts' Supp. Ex.* 3 at pages 6-7. Wilkinson complied. *Id.* Teas then began yelling: "They're gonna have to take me to the hospital now because they're gonna come in here and beat me up." *Id.* Larkin indicates at this point Teas began to kick his cell door. *Id.* Teas continued to kick his cell door for about two minutes. *Id.* at page 6.

According to Teas, Wilkinson was his cell-mate. *Resp.* at ¶ 34(F). Teas states they were not talking through the door but were in the same cell. *Id.* Teas also denies he kicked anything. *Id.*

Morris instructed Teas to step out to pod control. *Defts' Supp. Ex.* 3 at page 6. Teas went to pod control and Larkin instructed him to face the wall and get on his knees. *Resp.* at ¶ 34(I). Larkin placed Teas in handcuffs and he and Collins escorted Teas to E-103 for lock-down. *Id.* at ¶ 34(J). While Teas was being taken to cell E-132, he tensed up his arms and tried to pull away from Collins and Larkin. *Id.* at ¶ 34(K). He was placed against the wall. *Id.*

Teas was put in the cell, instructed to prone out, the handcuffs were removed, and he was to stay like that until the door was shut. *Resp.* at ¶ 34(L). He was charged with a disciplinary of acting in a loud or boisterous manner. *Id.* at ¶ 35. He was found guilty and given ten days

lock-down and loss of privileges. *Id.* at ¶ 36. He appealed and the lock-down was affirmed. *Id.* at ¶ 37.

Teas maintains Nance authorized this move from E-102, the administrative segregation pod, into E-103, the punitive pod. *Resp.* at ¶ 34(J). Teas contends the move put him in harm's way. *Id.* at ¶¶ 34(J), ¶ 36 & page 120 (request that appears to be dated November 29, 2006, regarding threats made on his life–much of the exhibit is illegible).

On December 12th Teas was interviewed regarding a grievance he submitted on November 25th about Deputy Vanetta touching him inappropriately. *Resp.* at ¶ 41(A). He said Lt. Carter and Vanetta were escorting him after the floor had been waxed and he accidentally walked on the fresh wax. *Id.* at ¶ 41(B). When he did, Teas said Vanetta put his hand on Teas' buttocks then grabbed him by the arm with the same hand and pulled him out of the fresh wax. *Id.*

Vanetta touched Teas on his buttocks. *Resp.* at ¶ 41(C). However, during the interview Teas stated the touching was more of a brush of the hand on his buttocks prior to the grab of the arm and he now believed it was accidental. *Id.*

On January 6, 2007, Teas asked to be separated from Travis France and Brandon Laiten so they wouldn't jump him. *Resp.* at ¶ 48 and *Resp.* at page 121. He was moved. *Id.* at ¶ 48.

On February 1st Teas was observed by Deputy Carter hitting Inmate McMannis. *Resp.* at ¶ 59(A). He was taken to the nurse's station and examined. *Id.* He was locked down for assaulting an inmate. *Id.* at ¶ 59(B). He was given a disciplinary hearing, found guilty, and locked down for thirty days. *Id.* at ¶ 59(C). He appealed and the decision was affirmed. *Id.* On

-9-

February 2nd he submitted a request asking for a blood test because he believed McMannis had Hepatitis.  *Id.* at ¶ 59(D).

On May 12th Teas submitted a request to use the law library.  *Resp.* at ¶ 85(A).  He noted Judge Clinger relieved the public defender's office from his case.  *Id.*  He stated he had no lawyer at this time.  *Id.*  In response, Teas was told Judge Clinger had appointed another attorney.  *Id.*

On May 13th Teas submitted a grievance about not being allowed to use the law library. *Resp.* at ¶ 85(B).  He stated on May 10th Judge Clinger had relieved the public defender's office of his case.  *Id.*  So, he stated he did not have an attorney right now.  *Id.*  Despite that he said he was refused library access.  *Id.*  In response he was told he was represented by an attorney.  *Id.* Teas, however, states he did not have an attorney.  *Id.* at ¶ 85.

On May 14th Teas and Inmate Andrew Vancil were involved in a physical altercation in D-130 cell -130.  *Resp.* at ¶ 86(A).  When Deputy Counts and Deputy Simmons entered the cell Vancil was next to the cell door with a bloody face and Teas was on his knees with his hands on the wall.  *Id.* at ¶ 86(B).  Both inmates were charged with disciplinary violations for fighting. *Id.* at ¶ 86(C).  Teas was found guilty and locked down for thirty days with loss of privileges. *Id.*

On May 14th Teas submitted another request about the law library.  *Resp.* at ¶ 87.  He was again told that he did have an attorney.  *Id.*  Teas states he was also trying to challenge the conditions of his confinement.  *Id.*

On May 18th Teas submitted yet another grievance about being denied access to the law library.  *Resp.* at ¶ 89.  He said he was being told he had an attorney but no one could tell him

-10-

who.  *Id.*  He said he did not have an attorney for Division II at this time.  *Id.*  In response he was he was represented by Attorney Paul Reynolds.  *Id.*

On May 22nd Teas stated that Judge Keith in Division I verbally told the deputies to allow him access to the law library.  *Resp.* at ¶ 91.  Despite these orders, Teas indicates he was still refused access.  *Id.*  In response, he was told he was represented by an attorney.  *Id.*

On the 26th Teas complained that he had filled out between eight and ten requests to use the law library and had not been able to use it even though he did not have an attorney in Division II.  *Resp.* at ¶ 92.  In response, he was told he was represented by an attorney.  *Id.*  Teas, however, states he did not have an attorney at this time.  *Id.*

Teas was asked whether he missed any deadlines for filing any documents with the court or was otherwise unable to pursue a claim because he did not have access to the law library.  *Resp.* at ¶ 93(B).  Teas had criminal charges pending in both Division I and Division II in Benton County.  *Resp.* at ¶ 94.  Because he did not have appointed counsel for a period of time and was unable to conduct research, Teas states in his criminal case by the time he was able to get research done his plea bargain had gone up instead of down.  *Id.*  If he had been able to research the law sooner, he states he would have plead out earlier.  *Id.*  Furthermore, he states he did not know that he only had ten days to ask for a jury trial.  *Id.*  Because he was unaware of this, he states he has now been denied the right to a jury trial in this civil rights case.  *Id.*

Teas was able to send and receive legal mail.  *Resp.* at ¶ 93(C).  He had access to basic writing materials such as pens, pencils, and paper.  *Id.* at ¶ 93(D).  On May 25th and May 30th Teas was advised that the Conflicts Office had been appointed to represent him with respect to his Division II charges and he was given the address of the Conflicts Office.  *Resp.* at ¶ 95.

-11-

On August 5th Teas asked Deputy Pop to open his cell door so he could get his indigents. *Resp.* at ¶ 110(A).  Pop did so but told Teas that he should have taken them out when he left his cell.  *Id.*  About 3 minutes later Teas was still in the cell, and Pop told him to get out of the cell. *Id.* at ¶ 110(B).  He repeated the order five times.  *Id.*  Teas appeared at the cell door brushing his teeth.  *Id.*  Pop told Teas to get his indigents and get out of the cell.  *Id.*

Pop told Teas if he was not coming out he would take him out.  *Resp.* at ¶ 110(C).  Pop started walking up the stairs towards Teas' cell.  *Id.*  He told Teas that he would lock him down. *Id.*  Pop had Teas take his mat and bed roll to pod control.  *Id.* at ¶ 110(D).

As Pop escorted Teas to his cell, he started screaming:  "Pop don't grab my a– again." *Resp.* at ¶ 110(D)  At the time, Pop was five steps behind Teas.  *Id*  Deputy Elkinton was watching from pod control.  *Id.* at ¶ 110(E).  Teas then said:  "Be honest Pop, be honest."  *Id.* at ¶ 110(F).

Pop escorted Teas back to his cell.  *Resp.* at ¶ 110(G).  He was given a disciplinary for refusing to obey an order of a deputy.  *Id.*  He was found guilty, given ten days lock down and loss of privileges.  *Id.*  He appealed and the decision was affirmed.  *Id.*

On November 18th Teas again requested law library access and it was granted.  *Resp.* at ¶ 125.  On November 26th Thompson and Lockhart came into D-153 because Teas was yelling and gesturing down at the inmates in the day-room.  *Id.* at ¶ 127(A).  Teas was told he was going to be locked down for loitering and instructed to collect his belongings.  *Id.* at ¶ 127(B).  He was told at least twice to quit talking.  *Id.*

When he reached the day-room, Lockhart again instructed Teas to stop talking and get out to pod control immediately.  *Id.* at ¶ 127(C).  Teas turned around and yelled:  "F— Y–."  *Id.*

-12-

Lockhart then ordered Teas to the wall. *Id.* at ¶ 127(D).  Teas turned away. *Id.*

Lockhart grasped Teas' shirt between the shoulder blades with his right hand and performed a wrist lock on his left wrist with his left hand. *Resp.* at ¶ 127(D).  Lockhart placed Teas on the wall and ordered him to his knees. *Id.*  Teas dropped his mat and belongings and pushed back from the wall. *Id.* at ¶ 127(F).  Lockhart tightened the wrist lock while ordering Teas to stop resisting and get to his knees. *Id.*  Teas yelled that Lockhart was hurting him and began to bang his head against the wall. *Id.*  Lockhart placed him on the floor. *Id.*

Thompson had previously exited the pod. *Resp.* at ¶ 127(G).  A few minutes later, he saw Teas hitting his head on the wall. *Id.*  Thompson re-entered the pod and helped Lockhart gain control of his right arm. *Id.*  In the process, Thompson fell on his right knee and felt pain. *Defts' Ex.* 3 at page 5.  The deputies helped Teas to his feet. *Id.*

Teas was removed from the pod and told he would be locked down for being disrespectful comments towards jail staff. *Resp.* at ¶ 127(I).  As he reached the D-pod sliding door, he attempted to pull away from the officers by falling to the floor. *Id.*  Thompson pulled Teas to back up to his feet. *Defts' Ex.* 3 at page 5.  As Thompson did so, he stepped on Teas' pants leg and that pulled his pants down. *Id.*  Teas was told to pull his pants up and escorted to his assigned cell E-108. *Resp.* at ¶ 127(K).  He yelled: "Hey Lockhart, you're still a f------ p----." *Id.*

Teas was charged with loitering on the top tier. *Resp.* at ¶ 128(A).  He was found guilty and given five days lock-down and loss of privileges. *Id.* at ¶ 128(B).  He appealed the decision and it was affirmed. *Id.* at ¶ 128(C).

-13-

He was also charged with disrespectful comments and using obscene language towards jail staff.  *Resp.* at ¶ 129(A).   He admitted saying "f— y—" but indicated Lockhart was disrespectful to him.  *Id.* at ¶ 129(B).  He was found guilty and given ten days lock-down and loss of privileges.  *Id.* at ¶ 129(C).  He appealed and the decision was affirmed.  *Id.*

Teas submitted the following requests regarding medical issues:

-14-

October 12, 2006, not on medication and couldn't sleep *Resp.* at ¶ 11(A)-(C); October 13th, swollen tonsils, waking up with blood in his mouth from having bitten tongue, *Resp.* at ¶ 11(D); October 15th woke up with blood in his mouth thought he had seizure in his sleep, *Resp.* at ¶ 12(A); October 16th, believed he was having seizures and felt his heart was going to explode, *Resp.* at ¶ 12(B); October 20th complained of nightmares and an apparent seizure during his sleep, *Resp.* at ¶ 16(A); October 22nd new medication was helping tremendously needed help figuring out what was going on in his head, *Resp.* at ¶ 16(B); October 23rd requested medical treatment as a result of hearing voices, *Resp.* at ¶ 24; October 26th seen at St. Mary's Hospital with complaints of vomiting, *Resp.* at ¶ 20; October 28th requested medical treatment for mental problems, *Resp.* at ¶ 25(A);

November 9th requesting medical treatment because the meat was causing him to be sick and throw up blood, *Resp.* at ¶ 31(A); December 8th requesting medical treatment because the cheese he was receiving was making him sick and the medicine he was on for it didn't help, *Resp.* at ¶ 32(B); December 10th having a reaction to medication, *Resp.* at ¶ 38; December 10th medication given to help "stomach the meat" was not working, *Resp.* at ¶ 39; December 28th requesting treatment because of the voices in his head, *Resp.* at ¶ 45;

January 3, 2007, requesting treatment because of his nose bleeding and voices, *Resp.* at ¶ 46; January 5th placed on the high blood pressure list and instructed to rest, *Resp.* at ¶ 47; January 13th treated for complaints of high blood pressure and instructed to lay down, *Resp.* at ¶ 51; January 18th complaints of chest pain, *Resp.* at ¶ 53; February 2nd fingers infected, *Resp.* at ¶ 60; February 25th complaints of bleeding gums, *Resp.* at ¶ 62; March 2nd complaints of swollen and infected gums, *Resp.* at ¶ 65(A); March 11th complaining of having been taken off Paxil and Klonopin, *Resp.* at ¶ 66; March 24th request to see the doctor about getting Doxepin during the day too, *Resp.* at ¶ 69(A); March 31st request to see the doctor about Doxepin, *Resp.* at ¶ 71;

April 14th request to see the doctor about getting Seroquel raised, *Resp.* at ¶ 75; April 27th asking to see the doctor about medication being discontinued, *Resp.* at ¶ 79; April 29th request to see the doctor about medication being discontinued, *Resp.* at ¶ 81; April 30th request to see the doctor because of problems, *Resp.* at ¶ 82; May 1st request to see the doctor about some issues, *Resp.* at ¶ 83; May 16th request for treatment due to swollen hand, *Resp.* at ¶ 88; June 23rd ingrown toenail, *Resp.* at ¶ 99;

August 3rd request for treatment because something was "pulled loose," *Resp.* at ¶ 108; August 7th full body rash, *Resp.* at ¶ 111; August 12th allergic reaction all over his body and couldn't breathe, *Resp.* at ¶ 114; August 29th pulled a muscle

-15-

in his back or twisted his neck again, *Resp.* at ¶ 117(A); September 22nd hearing people and voices in the walls again, *Resp.* at ¶ 119; October 10th toe infected and swollen, *Resp.* at ¶ 121(A); and October 18th back pain, *Resp.* at ¶ 122.

With the exception of an order for a clear liquid diet for twelve hours from St. Mary's Hospital that was never carried out, Teas indicates he received all medical care ordered by medical personnel. *Resp.* at ¶ 133 and page 122.  None of the defendants interfered in anyway with medical care or treatment ordered by the jail medical staff. *Id.* at ¶ 134.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

-16-

## III. DISCUSSION

Defendants have now moved for summary judgment.  First, defendants maintain that Teas was not denied reasonable access to the courts and legal system.  Second, defendants maintain excessive force was not used against Teas.  Third, to the extent Teas asserts a claim based on inadequacies in the grievance procedure and his use of the grievance procedure, defendants argue such claim fails as a matter of law because there is no constitutional right to receive responses to grievances.  We will address each claim in turn.

### *Access to the Courts*

"Inmates undeniably enjoy a constitutional right of access to the courts and the legal system." *Myers v. Hundley*, 101 F.3d 542, 544 (8th Cir. 1996)(*citing*, *Lewis v. Casey*, 518 U.S. 343, 116 S. Ct. 2174, 2179, 135 L. Ed. 2d 606 (1996); *Bounds v. Smith*, 430 U.S. 817, 821, 97 S. Ct. 1491, 1494-95, 52 L. Ed. 2d 72 (1977)).   In *Myers,* the Eighth Circuit stated that:

> [t]o protect that right, prisons must provide inmates with some access to legal materials or to legal assistance so that inmates can prepare and pursue complaints, and with some ability to mail these complaints and related legal correspondence once prepared. Inmates do not have a right, however, either to law libraries or to unlimited stamp allowances for legal mail.  Instead, the duty to make such arrangements is bounded by the inmates' right of meaningful access to the courts.  To state a claim that a law library or legal assistance program violates this right, inmates must assert that they suffered an actual injury to pending or contemplated legal claims.  Alleging theoretical inadequacies is insufficient. Inmates must instead show, for example, that a complaint that they prepared was dismissed due to a technical requirement that a library's inadequacies prevented them from knowing, or that a library was so inadequate that it prevented them from filing a complaint for actionable harm at all.

*Myers*, 101 F.3d at 544 (citations omitted).

-17-

In *Cody v. Weber*, 256 F. 3d 764 (8th Cir. 2001), the Eighth Circuit noted that the

Supreme Court in *Lewis v. Casey*, 518 U.S. 343, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996) and

*Bounds v. Smith*, 430 U.S. 817, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977), "determined that the right

of access to the courts guarantees an inmate the ability to file lawsuits that directly or collaterally

attack the inmate's sentence or that challenge the conditions of the inmate's confinement, but it

does not extend to the right to 'discover grievances' or to 'litigate effectively once in court.'"

*Cody*, 256 F. 3d at 767-68 (*quoting Lewis*, 518 U.S. at 354-55). *See e.g., Hartsfield v. Nichols*,

511 F.3d 826, 832 (8th Cir. 2008)(claim insufficient where he only "roughly and generally

asserted he was prevented from filing because he did not know what arguments to make.

Therefore, Hartsfield's claim that any complaint he would have filed would have been

insufficient is speculative.").

In this case, Teas was represented by appointed counsel the majority of the time in his

criminal matters.  It does appear that there may have been short period of time when Teas was

either unrepresented by appointed counsel or unaware of who his appointed counsel was.

Although Teas indicates he would have taken a plea bargain sooner had he been able to perform

research earlier, he does not support this conclusory assertion.  He does not indicate why he

chose to turn down the offer earlier, what his attorney advised, etc.

Furthermore, with respect to his civil rights complaint, he filed it while detained at the

BCDC.  He does maintain that he was unable to learn about the requirement that he demand a

jury trial in his complaint or within ten days of the answer being filed and has been held to have

waived his right to a jury trial on most issues.  He blames this waiver on defendants refusal to

grant him access to the library and/or the inadequacies of the library when he was granted access.

-18-

AO72A
(Rev. 8/82)

*See e.g., Resp.* at pages 143, 154, 155, 156.  However, to prove a violation of the right of meaningful access to the courts, Teas must show that a nonfrivolous legal claim had been frustrated or was being impeded.  *White v. Kautzky*, 494 F.3d 677, 679-81 (8th Cir. 2007).

Here, Teas has been able to pursue all his claims in court.  Moreover, he had at least some access to the law library.  He was able to send and receive legal mail and he missed no deadlines for filing any documents with the court.  He has not been precluded from pursuing any claims. There is no indication that Teas' failure to demand a jury trial was due to defendants impeding his access to the law library.  Defendants are entitled to summary judgment on this claim.

### Excessive Force Claim–October 5, 2006

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).  "[T]he constitutional standard applied may vary depending upon whether the victim is an arrestee, a pretrial detainee, or a convicted inmate of a penal institution."  *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001).

At the time of the alleged use of force on October 5, 2006, Teas was a pretrial detainee. In *Johnson-El v. Schoemehl,* the Eighth Circuit court noted that:

> [u]nlike convicted prisoners, the state has no right to punish [pretrial detainees].
> *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 1871-72, 60 L. Ed. 2d 447
> (1979).  Their confinement conditions are analyzed under the due process clause
> of the Fifth and Fourteenth Amendments rather than the Eighth Amendment's
> "cruel and unusual punishment" standard which is used for convicted prisoners.
> *Id*.  The injuries detainees suffer must be necessarily incident to administrative
> interests in safety, security and efficiency.    As a pretrial detainee, Freeman's
> excessive-force claim is properly analyzed under the due process clause of the

-19-

> Fourteenth Amendment.  *See Graham v. Conner*, 490 U.S. 386, 395 & n. 10
> (1989) (due process clause protects pretrial detainee from force amounting to
> punishment).

*Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989).

   The courts generally analyze excessive force claims of pretrial detainees in the same way as those of arrestees.  *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001)("The evaluation of excessive-force claims brought by pre-trial detainees, although grounded in the Fifth and Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective reasonableness standard.").  The use of force must be necessary to some legitimate institutional interest such as safety, security, or efficiency, and the force used must not be in excess of that reasonably believed necessary to achieve those goals.  *See Schoemehl*, 878 F.2d at 1048.  The relevant inquiry being whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them.  *See e.g., Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996).

   Shortly before 4:00 p.m., on October 5, 2006, it is undisputed that Teas was taken to Northwest Medical Center by ambulance following an incident at the Bentonville Police Department.  *Defts' Ex.* 5 at page 1.  Teas reported to Officer Ryan Seudel that he blacked out after having a seizure and fell to the cell floor.  *Id.*  Teas maintains he had a seizure as a result of having been beaten by several of the defendants at the BCDC.  *Resp.* at ¶ 6(A).  Records from the hospital show a fracture through the left L1 transverse process but of indeterminate date.  *Resp.* at 114.  A CT scan also showed mild soft tissue swelling on the scalp overlying the right frontal bone.  *Id.* at page 113.

-20-

The reported time of the incident at the Bentonville Police Department, however, is several hours **prior** to the incident at the BCDC which occurred according to the summary judgment record at approximately 8:00 p.m. *Resp.* at ¶ 10(A); *Defts' Ex.* 3 at page 1. Teas visit to the emergency room also occurred prior to the incident at the BCDC according to the summary judgment record.

Faulkenbury's report of the incident that occurred at the BCDC at approximately 8:00 p.m. varies from that of Teas. According to Faulkenbury, Teas was kicking the cell door, assumed an aggressive stance (bladed stance), took his shirt off, and told Faulkenbury to "come on, come get some." *Defts' Ex.* 3 at page 1. At this point, Faulkenbury asserts he administered a short burst of O.C. or pepper spray, closed the door, and instructed Deputies Brown and Vaughn to decontaminate him. *Id.*

Teas asserts he was naked and in five point restraints. *Resp.* at ¶ 10(G). He maintains Faulkenbury sprayed him in the face and crotch and he was left for hours before being decontaminated. *Id.* at ¶ 10(G) & ¶ 10(J). He indicates he was left with blisters on his face and genitals. *Id.* at ¶ 10(J). We note, however, that Teas submitted no request for treatment for blisters from chemical burns and did not mention any blisters in the medical request he submitted on October 12th. *See Resp.* at ¶ 11(A); *Defts' Ex.* 2, Vol. 1 at page 26.

In his own affidavit, Teas appears to refer to two separate incidents on October 5th. *Resp.* at page 117. He states that in the early morning hours of October 5th he was punched, kicked, and kneed by jailers while he was handcuffed and shackled. *Id.* Teas, however, does not

-21-

identify these officers by name.  He then states he was pepper sprayed by Faulkenbury in the face and crotch in the afternoon.  *Id.*

Teas also offers the affidavit of Eddie Sutton in support of his claim.  *Resp.* at page 111. Sutton states that on October 5th, shortly after midnight, he saw four deputies, Faulkenbury and a few others, jump Teas and spray him in the mouth and crotch.  *Id.* Sutton indicates the deputies chained Teas to the floor grate, kicked and punched him, ganged up on him, and kicked him in the ribs.  *Id.*

We believe there are genuine issues of material fact as to whether excessive force was used against Teas on October 5th.  Teas' statements are supported at least in part by the affidavit of Sutton.  Additionally, it appears that Teas contends at least some of the use of force against him occurred prior to his having been taken to the Bentonville Police Department.  This alleged use of force is not addressed in defendants' motion.

### *Excessive Force Claim–October 26, 2006*

The alleged use of excessive force on October 26th occurred while a shakedown of the cells was being performs at about 8:30 p.m.  Banging and yelling was heard coming from Teas' cell, 216 in E-102.  *Resp.* at ¶ 22(A); *Defts' Ex.* 3 at page 4.  Deputy Undiano, Corporal Paul, Corporal Becker, and Deputy Hernandez, entered E-102 and approached Teas' cell.  *Id.* According to the officers, Teas was ordered to the floor and did not comply.  *Defts' Ex.* 3 at page 1.  He was then placed on the floor and put in restraints.  *Id.*

-22-

Teas, however, states he was already face down on the floor when the cell door opened. *Resp.* at ¶ 22(C) & ¶ 22(J).  After he was cuffed and shackled, he maintains his head was smashed into the concrete and he was punched and kicked numerous times.  *Id.*  He states the cuffs were placed on so tightly he still has scars on his wrists.  *Id.* at ¶ 22(J).  He also maintains he was sprayed with pepper spray and left for two hours.  *Id.* at ¶ 22(C) and ¶ 22(H).

In support, Teas offers the affidavit of Marshal Duncan.  *Resp.* at ¶ 118.  Duncan indicates he was in a booking cell on October 26th when Deputy Becker, Deputy Undiano, and Deputy Baker, dragged Teas by leg chains into the shower in booking.  *Id.*  Duncan indicates Teas was in handcuffs and shackles and had blood all over him.  *Id.*  According to Duncan, Teas was nonresponsive.  *Id.*  Faulkenbury was behind the deputies and ordered other deputies to call the emergency medical technicians.  *Id.*

Teas has also submitted the affidavit of Travis France.  *Resp.* at page 119.  France indicates he was in the pod on October 26th when Deputies Baker, Undiano and Becker came in and put Teas in handcuffs and shackles and punched and kneed him while he was on the ground.  *Id.*  France indicates he saw the deputies carry Teas out of the cell because he had been knocked unconscious.  *Id.*

At 10:19 Deputy Martinez reported that he was told Teas needed to be transported to the hospital.  *Resp.* at ¶ 23(A).  Teas was treated at the emergency room of St. Mary's Hospital with complaints of vomiting blood.  *Defts' Ex.* 2, Vol. 1 at pages 39 & 43; *Defts' Ex.* 3 at page 3.  He was discharged with Phenergan and instructions to use Pepcid AC daily for two weeks and to consume clear liquids for the next twelve hours.  *Defts' Ex.* 2, Vol 1 at page 35.

-23-

We believe there are also genuine issues of fact as to whether excessive force was used against Teas on this occasion.  The parties have offered contradictory versions of the what occurred when Teas' cell was entered and the regarding the amount of force employed against him.  The court is not free at the summary judgment stage to believe one parties' version of the events and disbelieve the other parties'.

### *Inadequacies in the Grievance Procedures/Retaliation for Use of the Grievance Procedure*

Teas contends his grievances were not handled properly.  However, he has not identified a federal constitutional right that he was deprived of because of the alleged inadequacies in the grievance procedures.  He makes no argument that he was treated differently from other similarly situated prisoners, or that his grievances were ignored because of his exercise of his First Amendment rights, or that his ability to exercise any specific constitutional right was chilled by defendants' actions.

"Inmates do not have a constitutionally protected right to a grievance procedure.  Because a . . . grievance procedure does not confer any substantive right upon prison inmates, a prison official's failure to comply with the . . .  grievance procedure is not actionable under § 1983." *Ashann-Ra v. Commonwealth of Virginia*, 112 F. Supp. 2d 559, 569 (W.D. Va. 2000)(citations omitted).  *See also Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)(inmates have no constitutional right to grievance procedure); *Blagman v. White*, 112 F. Supp. 2d 534 (E.D. Va. 2000)(inmate has no constitutional entitlement to grievance procedure), *aff'd*, 3 Fed. Appx. 23 (4th Cir. 2001).

"Rather, prison inmates have a constitutional right to petition the government for redress

-24-

through a right of access to the courts." *Blagman*, 112 F. Supp. 2d at 542 (*citing Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991)).   A jail's "refusal to entertain such grievances does not compromise the inmate's constitutional rights, as access to the courts would still be available." *Blagman*, 112 F. Supp. 2d at 542 (*citing, Scott v. Kelly*, 107 F. Supp. 2d 706 (E.D. Va. 2000), *aff'd*, 6 Fed. Appx. 187 (4th Cir. 2001)).   "[A]ny alleged due process violation arising from the alleged failure to investigate his grievances is indisputably meritless." *Geiger v. Jowers,* 404 F.3d 371, 374 (5th Cir. 2005).

Teas also appears to allege that Faulkenbury took various actions against him in retaliation for his having used the grievance procedure.   Specifically, Teas alleges Faulkenbury refused him law library access, acted in an aggravated manner towards him, and failed to respond to grievances. In general, "[c]onduct that retaliates against the exercise of a constitutionally protected right is actionable, even if the conduct would have been proper if motivated by a different reason." *Cody v. Weber*, 256 F.3d 764, 771 (8th Cir. 2001)(citation omitted); *Madewell v. Roberts*, 909 F.2d 1203, 1206 (8th Cir. 1990)(same).   "Indeed, the retaliatory conduct does not itself need to be a constitutional violation in order to be actionable." *Id.   See also Dixon v. Brown*, 38 F.3d 379, 380 (8th Cir. 1994)("[W]hen retaliatory conduct is involved, there is no independent injury requirement.").

To prevail on his retaliation claim, Teas must demonstrate: (1) that he engaged in protected activity; (2) that the defendants in response took adverse action; and (3) that his protected activity was the cause of the retaliation. *See Burgess v. Moore*, 39 F.3d 216, 218 (8th Cir. 1994)(threat of retaliation is sufficient injury if made in retaliation for inmate's use of prison grievance procedure).

"The filing of a prison grievance, like the filing of an inmate lawsuit, is protected First Amendment activity." *Lewis v. Jacks*, 486 F.3d 1025, 1029 (8th Cir. 2007). "To avoid summary judgment, [Teas] must submit affirmative evidence [of] retaliatory motive." *Id.* (internal quotation marks and citation omitted).

Because nearly every otherwise routine administrative decision may potentially be viewed as a retaliatory act, it has been recognized that "[r]etaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). Further, the courts have recognized that prison officials must have broad administrative authority. *Graham*, 89 F.3d at 79. For this reason, it has been said that "courts must approach prisoner claims of retaliation with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001)(not every response to a prisoner's exercise of a constitutional right is actionable). *See also Atkinson v. Bohn*, 91 F.3d 1127, 1129 (8th Cir. 1996)(per curiam)(Speculative and conclusory allegations cannot support a retaliation claim).

In this case, Teas' grievances and/or requests regarding law library access were responded to by a number of officers including Lt. Carter, Captain Petray, Sgt. Nance, and other officers whose signatures cannot be deciphered. *See e.g., Defts' Supp. Ex.* 4, Vol. I at pages 1, 2, 3, 4, 6; *Defts' Supp. Ex.* 4, Vol. II at pages 1, 9, 11, 12, 13. There is no indication of a connection between Teas having asked for use of the law library and the alleged use of excessive force against him on October 5, 2006, or October 26, 2006.

-26-

### Captain Petray and Sheriff Ferguson

With respect to Captain Petray, Teas maintains he violated his rights by denying him access to the law library on several occasions. *Resp.* at ¶ 135. As noted above, we found defendants entitled to summary judgment on this claim. Teas also contends Captain Petray failed to supervise his officers and see they maintained professional conduct to ensure that Teas' rights were not violated. *Resp.* at ¶ 135.

Similarly, with respect to Sheriff Ferguson, Teas asserts he failed to maintain his jail in a safe manner. *Resp.* at ¶ 135. Teas further asserts that Sheriff Ferguson failed to supervise his deputies and train them properly. *Id.*

The doctrine of respondeat superior does not apply under section 1983. *See e.g., Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001). Instead, Sheriff Ferguson and Captain Petray may only be held liable if their failure to train or to supervise the offending employee caused the deprivation of constitutional rights and they had notice that the training procedures were inadequate and likely to result in a constitutional violation. *Id.* While Teas makes the conclusory allegation that Sheriff Ferguson and Captain Petray failed to supervise and train their deputies and that these failures resulted in the violation of his constitutional rights, Teas does not support these allegation with any facts. *See e.g., Riehm v. Engelking*, 538 F.3d 952, 963 (8th Cir. 2008)("The Riehms present no evidence that DeBevec was directly involved in the alleged constitutional violations or that she failed to train or supervise Diercks."). Teas simply makes these blanket statements. Sheriff Ferguson and Captain Petray cannot be held liable based solely on their general responsibility to oversee the operations of the BCDC. *See e.g., Popoalii v. Corr.*

-27-

*Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008); *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995)(when supervisory liability under § 1983 attaches). We find no genuine issue of material fact exists on this claim.

## IV.  CONCLUSION

I therefore recommend that the motion for summary judgment (Doc. 42) be denied in part and granted in part.  Specifically, I recommend the motion be granted with respect to the following claims:  (1) plaintiffs denial of access to the court's claim; (2) his claim that the grievance procedure at the Benton County Detention Center is inadequate; (3) his claim that he was retaliated against for filing grievances; and (4) his claims against Captain Hunter Petray and Sheriff Keith Ferguson.  I recommend that the motion be denied with respect to plaintiff's claim that excessive force was allegedly used against him on October 5, 2006, and October 26, 2006.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 4th day of March 2009.

/s/ *J. Marschewski*

HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

-28-